FILED
U.S DISTRICT COURT CLERK
WESTERN DISTRICT OF KY

**15 JAN 26 PM 2: 20**

Mark W. Leach
The Mark W. Leach Law Firm, PSC
171 N Peterson Ave
Louisville, KY 40206
(502) 938-4864
Email: markwleach321@gmail.com

*Attorney for Plaintiffs/Relators*

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SALLIE MCADOO and STEVEN ALDRIDGE<br><br>Plaintiffs,<br><br>vs.<br><br>NATERA, INC.<br>201 Industrial Road, Suite 410<br>San Carlos, CA 94070<br><br>Serve:<br>   National Registered Agents, Inc.<br>   818 W Seventh St<br>   Los Angeles, CA 90017<br><br>Defendant. | CASE NO. _3:15-cv-88-DJH_<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs United States of America, *ex rel.* Sallie McAdoo ("McAdoo") and Steven Aldridge ("Aldridge"), brings this Complaint against the defendant, Natera, Inc. ("Natera" or "Defendant") for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* The Defendant has engaged in long-standing and pervasive fraudulent billing to federal and state health care programs resulting in over $20 million in improper claims.

## I. JURISDICTION AND VENUE

1.    This is an action to recover damages and civil penalties arising out of false claims presented by Defendant to the United States. The Court has jurisdiction over the subject matter of this action under both 28 U.S.C. § 1331 and the False Claims Act, 31

U.S.C. § 3729 *et seq.* (the "Act"), which provides that the United States District Court shall have jurisdiction of actions brought under the Act.

2.    The Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the Act authorizes nationwide service of process and defendants have sufficient minimum contacts with the United States.

3.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found, resides, or has transacted business in the Western District of Kentucky.

4.    As required by the Act, 31 U.S.C. § 3730(b)(2), Plaintiffs have provided to the Government, simultaneously with the filing of this Complaint, a statement of substantially all material evidence and information related to this Complaint. This disclosure statement is supported by evidence establishing the Defendant's submission of false claims to the Government.

## II.  THE PARTIES

5.    The Relators in this action are Sallie McAdoo and her husband Steven Aldridge. Ms. McAdoo and Mr. Aldridge both worked for the genetic testing laboratory Natera, Inc. out of its San Carlos, California offices.

6.    The Relators bring this action for violations of the Act on behalf of themselves and the United States, pursuant to 31 U.S.C. 3730(b)(1).

7.    Natera, the Defendant, is a California corporation that provides genetic testing laboratory services. During the relevant period, Defendant perpetrated a fraud on the United States by making materially false representations in the submission of claims to federal payors for reimbursement, to include Medicaid, TriCare, and Champus. The

2

Defendant was also unjustly enriched by the improper payments from the federal programs. The Defendant should be required to account for and disgorge its unlawful profits.

### III. FACTS

A.    False Claims Act

8.    The False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") imposes liability on any person or corporation that knowingly presents or causes to be presented a false or fraudulent claim to the United States government for payment or approval (31 U.S.C. § 3729(a)(1)); any person or corporation that makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States government (31 U.S.C. §3729(a)(2)); and/or, conspires to defraud the Government by getting a false or fraudulent claim allowed or paid (31 U.S.C. § 3729(a)(3)). Proof of specific intent is not required.

9.    The FCA provides that any person who violates any of the aforementioned provisions is liable not just for return of all payments falsely made, but also for civil penalties of up to $11,000 per false claim, and for three times the amount of the damages sustained by the government. The FCA further provides that any person with direct and original knowledge of false claims submitted to the United States by a person or corporation may bring an action on behalf of the United States and may obtain a share of the damages and civil penalties recovered by the United States.

10.    States have enacted *qui tam* laws analogous to the Federal FCA that mirror its language. The same unlawful conduct of Natera alleged herein that gives rise to its liability under the FCA likewise gives rise to its liability under the laws of the States that have enacted analogous *qui tam* laws. As such, Natera is subject to civil monetary fines and penalties under both the FCA and the parallel statutes of those States.

B.    Federal Reimbursement for Health Care Claims.

11.    Medicaid is a joint federal-state program funded under Title XIX of the Social Security Act. Under this program, the United States and the individual States pay for certain medical care for the disabled and those who meet certain income requirements.

12.    In addition, the United States pays for medical care for military personnel, military retirees, and their dependents through the Tricare Program.

13.    The United States pays for medical care of federal employees through federal health insurance plans.

14.    At all times relevant to this Complaint, Natera provided and billed for services to participants in the Medicaid, Tricare, Champus, and Federal Health Insurance programs.

C.    Products of Conception & Single Nucleotide Polymorphisms

14.    Natera offers a test called "Anora," which tests products of conception or "POC." When a miscarriage occurs, genetic testing can inform whether there was a genetic condition that might explain the reason for miscarriage. Such a result is also relevant for certain conditions for recalculating the mother's chance of having a future pregnancy with the same condition.

15.    Natera sets itself apart in the prenatal genetic testing market by pioneering the use of "SNP"—or single nucleotide polymorphism—testing. SNPs are changes in the DNA sequencing.

16.    Traditional genetic testing concerned the chromosomes themselves. If chromosomes are like volumes in a set of encyclopedias, then SNPs are the words on the pages of each volume.

17.    By testing large numbers of SNPs, Natera's testing determines patterns from which it then reports results on whether a chromosomal imbalance has been detected by its SNP-based testing.

4

D.    Non-invasive prenatal screening

18.    In 1997, Dennis Lo's research team found DNA from the pregnancy floating in the mother's blood stream. Ever since has been a race to get to market a test based on that free floating DNA.

19.    Prenatal testing for genetic conditions exists primarily in two forms: screening and diagnostic testing. Screening tests do not definitively diagnosis a condition, but recalculate a mother's odds for having a child with a genetic condition, most commonly Down syndrome, but there are other conditions tested for. Diagnostic testing provides a definitive answer, but involves an invasive procedure of inserting a needle into the womb, carrying with it a risk of miscarriage.

20.    Lo et al.'s discovery provided the theoretical promise of arriving at a diagnosis without the risk of miscarriage, since the testing would be of actual DNA from the pregnancy but from a simple blood draw of the mother.

21.    Initially referred to as "Non-invasive prenatal diagnosis," or "NIPD," testing laboratories sought to develop a non-invasive prenatal test of the pregnancy DNA in the mother's blood that had the accuracy of providing a diagnosis. So far, however, none have.

22.    Instead, in October 2011, Sequenom was the first laboratory to enter the market with what is referred to as "Non-invasive prenatal screening" or "NIPS." The level of accuracy could not be attained to make Sequenom's test (called MaterniT21) diagnostic, so Sequenom went to market with the test as a screening test. Like other screening tests, NIPS provides a recalculation of the mother's chance for having a child with the tested-for condition. But, it still has false negatives and false positives, requiring an invasive diagnostic test still if the mother wants to know for certain.

23.    After Sequenom launched, Verinata joined the NIPS market with its test called "verifi." Then came Ariosa with its test, "Harmony." Last to enter the market, in December 2012, was Natera with its test, "Panorama."

5

24.     With over 4 million women pregnant each year in the United States, and NIPS being hailed as more accurate than any other screening test, the market has been valued in the billions.

D.     McAdoo's employment with Natera

25.     Ms. McAdoo began her career at Natera in November 2011, initially as a staff genetic counselor who would advise providers about Natera's tests and counsel patients by phone regarding the testing process and results. In the Spring of 2012, Ms. McAdoo's duties expanded to provide primary support for research and development of what would become Natera's Panorama test. She was promoted to Director of Medical Education & Clinical Affairs, once the product became commercially available, a position she held until leaving the company in January 2014.

26.     Ms. McAdoo worked out of Natera's main office in San Carlos, California. As Director of Medical Education & Clinical Affairs, her duties included:

- Presenting over 200 lectures on NIPS and prenatal testing domestically and internationally, including faculty trainings in Vienna and Brazil;
- Creating core educational materials and presentations for medical education meetings;
- Gathering information on NIPS competitors;
- Assisting in developing promotional initiatives for Natera's test offerings;
- Coordinating research protocols, clinical trial coordination, sample tracking, Institutional Review Board applications and maintenance, center recruitment, and on-going studies;
- Collaborating with Natera's senior executive team on decisions concerning company operations; and,
- Acting as *de facto* laboratory director for delayed results, specimen processing issues, and laboratory operations for NIPS.

27.     Ms. McAdoo received her Master's of Science in Human Genetics &

Genetic Counseling from Howard University, Washington, DC. She began her professional practice as a reproductive genetic counselor in 2000 at West Virginia University Hospital, advising patients undergoing prenatal care. In 2001, Ms. McAdoo joined Baylor College of Medicine, Houston, Texas, as a prenatal genetic counselor II and preimplantation genetic diagnosis program coordinator. Immediately prior to joining Natera, Ms. McAdoo served as a Genetic Counselor III for Genzyme Genetics, Houston, Texas, counseling patients on reproductive genetic referrals and indications.

28.     Since leaving Natera, Ms. McAdoo is currently serving as the Medical Science Liaison for Emory Genetics Laboratory, Atlanta, Georgia, performing much the same duties as she held at Natera regarding marketing, study development, and patient information materials for Emory's lab offerings.

E.      The False Claims

29.     Current procedural terminology (CPT) codes are set by the American Medical Association("AMA") and set how medical procedures are coded for reimbursement.

30.     Natera offers genetic testing based on single nucleotide polymorphisms ("SNPs"). Genetic testing is commonly associated with the testing of genes on chromosomes. Natera's technology differs from the testing methods used by the other laboratories offering NIPS and other chromosomal evaluation and is how Natera has tried to distinguish Panorama. Natera also uses its SNP-based technology for Anora.

31.     For health care billing, there are Current Procedural Terminology ("CPT") codes. One of these codes is for SNP-based testing, Code 81229, entitled "Cytogenomic interrogation of genomic regions for copy number and single nucleotide polymorphism (SNP) variants for chromosomal abnormalities"—what Natera's SNP-based testing does. However, Natera has been billing out its Panorama test at Code 88271. Code 88271 is a code usually used for a DNA region probe, like florescence in situ hybridization ("FISH") which identifies imbalances on regions of particular

7

chromosomes, not a SNP code. SNPs look at a smaller part of the DNA that is not necessarily always associated with a health condition, whereas FISH targets regions associated with a health condition. Natera also includes in its billing for Anora Code 88289, which is entitled "chromosome analysis; additional high resolution study." SNPs are a component of the chromosomes, not the chromosomes themselves.

32.     Natera knowingly made the decision to use improper codes for its tests.

33.     In the summer of 2012, Ms. McAdoo was invited to a meeting with Brad Roberts, Vice-President of Finance, Matthew Rabinowitz, CEO, Jonathan Sheena, Chief Technology Officer, and Margaret Miller, who ultimately would replace Roberts as Vice-President of Finance. Options for future billing for Panorama and a re-analysis of coding strategies for Natera's then-current offerings were discussed because of a concern about the reimbursement Natera was receiving at that time. At this meeting, Ms. McAdoo asked why Natera was not using Code 81229, the SNP-based code, Rabinowitz said, "because we don't get reimbursed for it." At this meeting it was discussed using Code 88271 for Panorama because Natera was receiving reimbursement under that code for its other SNP-based test offerings at that time.

34.     The DNA/chromosome codes bill out at a higher rate than the SNP code. The Centers for Medicare & Medicaid Services ("CMS") do not currently pay for the SNP code at all, since SNP technology is not yet recognized as standard of care (chromosomal testing remains the norm). By using other codes, Natera is able to obtain reimbursements that would not be paid at all if Natera used the appropriate code.

35.     The correct code, 81229 for SNPs, is limited to a single unit for $700. The DNA codes reimburse at between $30 to $40 but can be billed out in multiple units depending on how many regions are looked at in each sample. Natera billed out the DNA codes at units as high as 72 per test. This means a Panorama test that should be billed at the single-unit SNP code for $700 is instead billed out as high as $5,478, a mark-up of $4,778. This mark-up is even greater considering that the DNA code would only be billed

for the genetic regions assessed. Natera's Panorama test reported results for five chromosomes, 13, 18, 21, X and Y. At most, then, under the DNA code, it should have been billed out for only 5—one for each chromosome.

36.     Ms. McAdoo had raised her concerns about Natera's practice of up-coding several times during her tenure there.

37.     Out of the meetings that were held in 2012, Brad Roberts, Vice-President of Finance, drafted an application to the American Medical Association (AMA) for Natera to have its own code that was applicable to Panorama.

38.     In May 2013, Ms. McAdoo attended with Rabinowitz the AMA meeting in Chicago, Illinois where Natera's code application was on the agenda for consideration. At the meeting, the AMA denied Natera's application, telling Natera to wait until 2015 when new codes specifically being created for cell-free aneuploidy (NIPS) testing will become active. Rabinowitz told the panel that he did not want to wait that long because it would mean delayed reimbursement, asking "So, what am I supposed to do for billing until then?"

39.     Through 2013, Natera formed relationships with approximately twelve other laboratories, including Progenity, BioReference, ARUP, and Quest Diagnostics. The partner-laboratories would offer Natera's Panorama test, paying Natera a set amount for each test, around $800, with the partner-laboratory then billing insurance separately and receiving that reimbursement.

40.     In May 2013, Natera paid a consultant, Michael Beebe, Senior Vice-President and Partner at ADVI Reimbursement and Health Policy Advisory Services, to work on an application for a separate CPT code for Natera's microdeletions testing. Microdeletions occur when certain DNA regions on chromosomes are missing which can result in known conditions like DiGeorge syndrome.

41.     Through information from the partner-laboratories and Beebe, Natera learned that Ariosa, had received its own CPT code for its NIPS test, Code 88507 and

that other NIPS laboratories either were billing under Ariosa's CPT code or were using a "Miscellaneous" CPT code, usually 81479.

42.     At an executive meeting, which included Ms. McAdoo, Rabinowitz, and Steve Chapman, Vice-President of Sales, it was discussed whether Natera should use the "Miscellaneous" CPT code, use Ariosa's CPT Code, or apply for its own, having learned its competitors Sequenom and Verinata were applying for their own Codes at this time. Rabinowitz decided not to use the "Miscellaneous" code because it has uncertain reimbursement as it was inconsistently paid for depending on the insurer. Rabinowitz also decided not to use Ariosa's code because it may have been proprietary to Ariosa as the code had Ariosa's name on it, and because CMS had issued a statement that it would not reimburse MAAA codes, which is what the Ariosa code is.

43.     Ms. McAdoo contacted the AMA to receive copies of Sequenom's and Verinata's applications and asked that any decision on those codes would not be exclusive to their particular tests, but would apply to the NIPS tests generally. Natera would see whether the AMA approved Sequenom's and Verinata's applications and then attempt to "piggy-back" on their codes once approved.

44.     In October 2013, Ms. McAdoo and Chapman attended an AMA meeting in Los Angeles, California. Ms. McAdoo attended the meeting on new codes, which the AMA had referenced in denying Natera's 2012 application. Ms. McAdoo was on the committee that considered a new code for cell free DNA aneuploidy testing, generally, but the new code was not issued, only language describing the code was agreed upon. This was a closed meeting. Chapman attended the open meeting where Sequenom's and Verinata's applications were considered, which were also denied, as Natera's was, because of the new code for aneuploidy cell free DNA testing being developed.

45.     Having had its own application for a code denied, and then being denied the ability to piggy-back on Sequenom's and Verinata's applied-for codes when they were denied, Nathanial Weems, a director of Finance, and Rabinowitz instructed Ms.

McAdoo to review the available codes to see if Natera could use an existing code by adding SNP technology or additional disorders to its description and become included in the code's coverage.

46.    Ms. McAdoo found two codes that were possible candidates: CPT 81403 and CPT 81402. Weems was tasked to draft the application for modifying those codes, which were submitted to the AMA and discussed at the February 2014 AMA meeting in Phoenix, Arizona. At the 2014 AMA meeting, Weems' applications for Natera were denied. The aneuploidy cell free DNA code was approved and will be eligible for use beginning January 1, 2015.

47.    Despite knowing the codes Natera was using were improper, and having been denied thrice by the AMA, Natera continued billing out Panorama under the improper DNA/chromosome CPT Code 88271. Natera never attempted to change its coding for Anora, continuing to bill it out under CPT Code 88271 and 88289.

48.    Natera's improper billing practice was in place at the time Ms. McAdoo joined Natera and continued throughout her tenure there.

49.    Natera would bill for its tests directly. Under Nathanial Weems, Latoya Ferguson handled billing for Natera. Her team would bill Medicaid and TriCare programs as well as private insurance. Provided with the disclosure statement is a spreadsheet with numerous entries that was created in the ordinary course of Natera's business. The spreadsheet shows bills being sent to federal programs for Anora and these bills being paid by those programs. For example, on November 22, 2011, Natera billed Tricare $2,925 and Tricare paid $1,887.14. On December 15, 2011 and on January 18, 2012, Natera billed Champus $2,925 and Champus paid $802.95 and $1,003.69, respectively.

50.    Ms. Ferguson also voiced concern over Natera billing out at the wrong code. Meg Miller, the current Vice-President of Finance, also voiced concerns to Rabinowitz and others about Natera not using "the most appropriate code."

11

51.     Because the CPT code Natera should have been billing under is not currently reimbursed by CMS, Natera should not have been reimbursed at all for its Panorama or POC tests. As a result, any amount Natera was paid under the improper code is subject to recoupment.

F.      Retaliation against Steven Aldridge

52.     Steven Aldridge is Ms. McAdoo's husband. He began working for Natera at its San Carlos, California offices in April 2013.

53.     Aldridge began in accessioning, receiving all the samples sent to Natera and then transferring to the laboratory. His responsibilities included following up with providers on whether Natera's Panorama results were confirmed by diagnostic testing.

54.     Ms. McAdoo resigned from Natera in January 2014; Mr. Aldridge continued working at Natera, working remotely with permission by his supervisor Zach Demko.

55.     In March 2014, Ms. McAdoo and Mr. Aldridge saw that Natera had posted Aldridge's job description posted on-line as a Genetic Counselor Role. Mr. Aldridge asked Demko if he would be terminated from Natera's employment. Demko told Mr. Aldridge that he could be considered for other positions in the company; he could continue with Natera until the genetic counselor was hired for his position; or he could leave with severance.

56.     On March 25, 2014, Mr. Aldridge e-mailed Demko saying he would like to explore the option of remaining with Natera in another position. On March 26, 2014, the next day, Demko and Johanna Hart, head of Human Resources, called Mr. Aldridge saying they were going to stop doing follow up and eliminate Mr. Aldridge's position altogether.

57.     That same day, March 26, 2014, Mr. Aldridge spoke with Vice-President Darrin Crisitello, Chapman's successor as Vice-President of Sales, at a hotel in Nashville, Tennessee where Ms. McAdoo was attending the annual conference for the

12

American College of Medical Genetics and Genomics. Crisitello told Mr. Aldridge that at a Natera executive meeting, it was discussed that having Mr. Aldridge still working at Natera would provide Ms. McAdoo access to data that Natera that did not want her having access to.

## IV. CLAIMS

### COUNT ONE
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

58.     Plaintiff repeats and incorporates all preceding allegations.

59.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

60.     By virtue of the acts described above, Natera knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government.

61.     By virtue of the acts described above, Natera knowingly concealed the existence of its improper conduct from the United States Government in order to induce payment of false or fraudulent claims.

62.     The United States, unaware of the Natera's wrongdoing or the falsity of the records, statements or claims made by Natera or Natera's wrongdoing, paid claims that would not otherwise have been allowed.

63.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

### COUNT TWO
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

64.     Plaintiff repeats and incorporates all preceding allegations.

65.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

13

66.     By virtue of the acts described above, Natera knowingly concealed the existence of its improper conduct from the United States Government in order to induce payment of its false or fraudulent claims.

67.     The United States, unaware of the Natera's wrongdoing or the falsity of the records, statements, or claims made by Natera or Natera's wrongdoing, paid claims that would not otherwise have been allowed.

68.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

### COUNT THREE
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

69.     Plaintiff repeats and incorporates all preceding allegations.

70.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

71.     By virtue of the acts described above, Natera knowingly concealed an obligation to pay or transmit money to the United States Government.

72.     By virtue of the acts described above, Natera knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government.

73.     By virtue of the acts described above, Natera knowingly concealed the existence of its improper conduct from the United States Government in order to conceal and retain payments received as a result of their violations of the Act.

74.     The United States, unaware of Natera's wrongdoing or the falsity of the records, statements, or claims made by Natera or Natera's wrongdoing, paid claims that would not otherwise have been allowed.

75.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

14

## COUNT FOUR
### Violation of the False Claims Act
### 31 U.S.C. § 3730(h)(1)

76.     Plaintiff repeats and incorporates all preceding allegations.

77.     By virtue of the acts described above, Natera retaliated against Mr. Aldridge by terminating his employment based on Natera's concerns of providing Ms. McAdoo access to Natera's data.

78.     By reason of Natera's retaliation, Mr. Aldridge has been damaged, and continues to be damaged, in substantial amount.

### V. PRAYER FOR RELIEF

WHEREFORE, Relators request that judgment be entered in favor of the United States of America, and Relators against Renown as follows:

1.      Renown cease and desist from violating the Act;

2.      Renown pays an amount equal to three times the amount of damages that United States have sustained because of the Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of the Act;

3.      Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4.      Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d); and

5.      United States and Relators recover such other relief as the Court deems just and proper.

Respectfully submitted,

/s/

Mark W. Leach
The Mark W. Leach Law Firm, PSC
171 N Peterson Ave
Louisville, KY  40206
(502) 938-4864
markwleach321@gmail.com
*Counsel for Plaintiffs/Relators*